IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

**STATE OF TENNESSEE v. JOHNNIE RAY ASHFORD**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-537     Cheryl Blackburn, Judge**

**No. M2016-01558-CCA-R3-CD**

A Davidson County Criminal Court Jury convicted the Appellant, Johnnie Ray Ashford, of possession of a Schedule II controlled substance with intent to sell or deliver, a Class C felony, and attempting to sell a Schedule II controlled substance, a Class D felony, and he received an effective three-year sentence to be served on supervised probation.  On appeal, the Appellant contends that the trial court erred by denying his motion to suppress evidence, that the trial court improperly limited his cross-examination of a State witness regarding the witness's potential bias, that the evidence is insufficient to support the convictions, and that the prosecutor committed prosecutorial misconduct during closing arguments.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Emma Rae Tennent (on appeal) and Patrick Hakes and Julie Bigsby (at trial), Nashville, Tennessee, for the appellant, Johnnie Ray Ashford.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In May 2016, the Appellant was tried for selling oxycodone, a Schedule II controlled substance, and possessing oxycodone with intent to sell or deliver. At trial, Lonnie Tomberlind testified that about 10:00 a.m. on October 3, 2014, he met Debra Hudson at Hudson's mother's house. Denise Ryan joined them, and the three of them went to a "strip mall" at Briley Parkway and Glastonbury Road in Nashville. Ryan was driving, Hudson was sitting in the front passenger seat, and Tomberlind was sitting in the back seat. He said they went there to buy pills from the Appellant.

Tomberlind testified that when they arrived, the Appellant got into the back seat of Ryan's car and that he bought three oxycodone pills from the Appellant for nine dollars each. He said that he also gave the Appellant six dollars he owed the Appellant for a loan and that he thought Hudson paid the Appellant forty-five dollars for nine pills. Tomberlind saw the police "running up" and swallowed his three pills with Red Bull. He said that the police questioned him and that he eventually told them he bought oxycodone from the Appellant.

On cross-examination, Tomberlind acknowledged that he and the Appellant were friends. He also acknowledged that he told David Zoccola, an investigator from the prosecutor's office, that he had not been in trouble since October 3, 2014, the day of the drug buy. That statement was incorrect, though, because he had been charged with shoplifting. He described the shoplifting charge as "a little misdemeanor" and said he pled guilty to theft in December 2015. Tomberlind also acknowledged telling Zoccola that the five pills Hudson bought from the Appellant "disappeared from the scene" and that he thought the police gave the pills to a "whore." He said the police also "could have ate them themselves." Tomberlind said he did not remember telling Zoccola that the pills he bought from the Appellant cost seven or eight dollars each, and he acknowledged telling defense counsel before trial that he went to the strip mall on October 3 to pay the Appellant money he owed for a loan. Tomberlind said that he and the Appellant did not talk about any health problems on October 3 but acknowledged telling the police that the Appellant asked him some questions about cancer.

Tomberlind testified that after he bought pills from the Appellant, the police wrote him a citation for simple possession and let him go. He said that he later pled guilty to the charge but that it was expunged from his record. He acknowledged that the officers threatened to take him to jail if he did not tell them the Appellant sold him pills.

On redirect examination, Tomberlind testified that he told the officers the truth about buying pills from the Appellant. He acknowledged lying to defense counsel about why he went to the strip mall on October 3 but explained, "I really wanted to be on [the Appellant's] side. He had cancer, and I really didn't want to see him go to jail. And that's why I said that." He acknowledged that he was subpoenaed to testify by the State and that he did not want to testify against the Appellant.

Debra Hudson testified that Tomberlind and Ryan met her at her mother's home on the morning of October 3, 2014. Hudson then telephoned the Appellant "to get drugs." She specifically wanted Percocet, also known as oxycodone. When Hudson, Ryan, and Tomberlind arrived at the strip mall in Ryan's car, the Appellant got into the car with them and sold Hudson five pills for nine dollars each. The Appellant also sold pills to Ryan, but Hudson did not know if he sold any pills to Tomberlind. Hudson acknowledged that police officers approached the car after the sale and that she spoke with them.

On cross-examination, Hudson acknowledged telling defense counsel that the Appellant never sold her any pills. She said she lied to defense counsel. She also acknowledged telling Zoccola, the State's investigator, on the telephone on April 26, 2016, that she did not get any pills from the Appellant. Later that day, Zoccola came to Hudson's house, and she told him the truth about buying pills from the Appellant. She said she changed her story because Zoccola explained that she would go to jail if she perjured herself. Hudson acknowledged that after the police approached Ryan's car, she threw the five pills she had bought onto the floor. She said she did so because she was scared and thought the police would believe the pills belonged to Ryan. The police cited Hudson for simple possession.

On redirect examination, Hudson testified that when she spoke with Zoccola on April 26, 2016, she also told him that Tomberlind owed money to the Appellant, which was true. However, the main reason she, Ryan, and Tomberlind met with the Appellant on October 3, 2014, was to buy drugs from him. Hudson acknowledged that she was subpoenaed to the Appellant's trial and that she did not want to testify against him.

Detective Andrew Grega of the Metropolitan Nashville Police Department (MNPD) testified that in October 2014, he was working in an "undercover capacity" in the Hermitage Crime Suppression Unit. He explained that the Unit "hit the hot spots in the precinct. We did parking lot surveillance, we did drug buys, we did quote unquote buy busts. We focused on the heavy crime areas." On the morning of October 3, 2014, Detective Grega went to a strip mall parking lot at the intersection of Briley Parkway and Glastonbury Road to meet with his fellow team members. He was driving an unmarked black Ford pickup truck, and Detective Jonathan Spurlock was riding with him. The officers were in plain clothes but were wearing tactical vests marked with police badges and logos.

Detective Grega testified that he and Detective Spurlock parked in the parking lot and began watching a Mercedes[1] and a Buick. He said that the two cars were parked on

---

[1] Detective Grega testified at trial that the car was a Volvo or Mercedes and testified at the hearing on the motion to suppress that the car was a Volvo. However, Denise Ryan, the driver of the car, testified at trial that it was a Mercedes. Therefore, we will refer to the car as a Mercedes.

the side of the building and that "that side of the building was vacant, so there really wasn't any reason for anybody to be parking over there." Three people were in the Mercedes, and one person was in the Buick. Detective Grega said that based on his experience, he believed the people in the Mercedes were "waiting on drugs."

Detective Grega testified that he was parked to the right of the Mercedes and that he could see down into the car. The Appellant got out of the Buick, which was parked to the left of the Mercedes, and got into the back seat of the Mercedes, behind the driver. Detective Grega stated, "There was an exchange of quick talk, and then everybody [was] focused -- everybody that was already in the vehicle was focused on [the Appellant] who was in the backseat. You could see an exchange of money for some sort of item. You couldn't tell what it was." Detective Grega saw Hudson, who was sitting in the front passenger seat, and Tomberlind, who was sitting in the back seat with the Appellant, hand money to the Appellant. The Appellant then got out of the Mercedes. He had money in his hand and walked back toward the Buick. Detective Grega said the transaction was "quick," lasting only thirty seconds to one minute.

Detective Grega testified that at that point, he and Detective Spurlock exited the truck and "made contact with everybody involved." Detective Grega approached the Mercedes. He said that he and Tomberlind looked at each other; that Tomberlind had an "oh, crap, moment"; and that Tomberlind "took a pill that was in his hand and put it directly into his mouth and swallowed it." Detective Grega also saw a pill in a clear cigarette wrapper. The wrapper was "stuffed" between the front passenger seat and the center console. Detective Grega stated that "[p]ills don't belong in cigarette wrappers" and that "you see that a lot in narcotics transactions."

Detective Grega testified that he and Detective Spurlock had the three people in the Mercedes get out of the vehicle because "I believed we [had] just witnessed a narcotics transaction, and Mr. [Tomberlind's] actions started to verify that." The detectives read Miranda warnings to Ryan, Hudson, and Tomberlind, and Detective Grega determined that the pill in the cigarette wrapper was Percocet. He read Miranda warnings to the Appellant, whom he had never seen before that day, and the Appellant agreed to talk with him. The Appellant told Detective Grega that he was sick, needed money, and met Hudson, Tomberlind, and Ryan at the strip mall in order to sell them pills for nine dollars per pill. Detective Grega searched the Buick and found a prescription bottle for Percocet in the glove box. According to the label on the bottle, the Appellant had filled the prescription for ninety pills the previous day. Fifty-four pills remained in the bottle, and thirty-six pills were missing. Detective Grega calculated that if the Appellant had sold thirty-six pills for nine dollars each, the Appellant would have had $324. Detective Grega found $320 on the Appellant's person and arrested him. Detective Grega issued citations to Hudson and Tomberlind for simple possession. He did not issue a citation to Ryan because she was "just driving."

- 4 -

On cross-examination, Detective Grega testified that he was not conducting surveillance on the parking lot on October 3 and that the parking lot was not in a high-crime area. He acknowledged that he filled out the incident report for this case and that he did not mention the hand-to-hand drug transaction or the Appellant's admission about selling pills in the report. Detective Grega testified at a hearing two months after the incident and also did not mention the hand-to-hand transaction during the hearing. However, he testified at the hearing that he saw money in the Appellant's hand. Defense counsel asked if Detective Grega was parked "right next to" the Mercedes, and he answered, "Not right next to them, no. . . . A couple of spots over." He said he did not recall testifying at a previous hearing that he did not remember where he was parked.

On redirect examination, Detective Grega testified that he also filled out forfeiture and arrest warrants in this case. In the forfeiture warrant, he stated that he saw the Appellant conduct a transaction with the passengers in the back seat and the front seat and that the Appellant said he sold oxycodone pills to the two passengers for nine dollars per pill. Detective Grega stated in the arrest warrant that the Appellant admitted to selling pills.

Detective Jonathan Spurlock testified that he and Detective Grega went to the strip mall parking lot on the morning of October 3, 2014, but that they were not there to conduct surveillance. When they pulled into the parking lot, they saw a Mercedes with four people in the car. A Buick was parked to the left of the Mercedes, and no one was in the Buick.

Detective Spurlock testified that he and Detective Grega began watching the Mercedes and that the people in the car could have been dealing narcotics or "simply there hanging out." Detective Grega's truck was "one spot over from the Mercedes," and Detective Spurlock could see into the car. The Appellant, who was in the back seat, had money in his hand and was talking to the driver and the front passenger. Detective Spurlock saw "several hand movements back and forth" and saw the Appellant receive money from the front passenger. Detective Spurlock did not see any other exchange and thought he had just witnessed a drug deal.

Detective Spurlock testified that the Appellant got back into the Buick and that "[a]t that time we said, let's just make contact." Detective Spurlock approached the Appellant and began speaking with him. He told the Appellant his name and asked what the Appellant was doing in the area. The Appellant seemed nervous and could not give Detective Spurlock a "straight" answer. During their conversation, Detective Spurlock heard Detective Grega say that pills were in the Mercedes. At that point, the officers began "making the scene safe" and had everyone get out of the cars. Detective Grega read Miranda warnings to the Appellant, and the Appellant agreed to talk with him. The Appellant told Detective Grega that "he was there to sell the prescription that he had to make money." The Appellant said he had cancer and needed to sell the pills. Detective

Spurlock searched the Appellant and found $320 on his person. The money consisted of fourteen twenty-dollar bills and four ten-dollar bills; no five- or one-dollar bills were found.

On cross-examination, Detective Spurlock testified that he thought he saw money in the Appellant's hand when the Appellant got out of the Mercedes. However, he acknowledged testifying at a prior hearing that he did not see money in the Appellant's hand.

At the conclusion of Detective Spurlock's testimony, the parties stipulated that the pill found in the Mercedes and the pills found in the prescription bottle were oxycodone. The State rested its case.

Denise Ryan testified that on October 3, 2014, she "gave some people a ride to pay [the Appellant] some money they owed him." Ryan did not drive Hudson and Tomberlind to the parking lot in order for them to buy drugs, and she did not buy prescription medication from the Appellant. At that time, Ryan had her own prescription for Percocet due to cancer, and her pill bottle was in her purse.

On cross-examination, Ryan denied telling Detective Grega that she drove Hudson and Tomberlind to the parking lot to buy drugs. She said she told him that she drove them there to pay a debt they owed. She denied knowing the police found a pill inside a cigarette wrapper in her car.

Toni Ashford, the Appellant's wife, identified the prescription bottle found in his car on October 3, 2014, and testified that she "fix[ed]" the Appellant's medication every week by filling his seven-day pill container. The Appellant filled his prescription for Percocet on October 2 and consumed three pills that day as prescribed. Mrs. Ashford removed another twenty-one pills from the bottle and put them into the Appellant's weekly pill container. In October 2014, the Appellant and Mrs. Ashford lived in an apartment and paid $625 per month in rent. The Appellant paid $300 in the first part of the month when he received his Social Security check, and Mrs. Ashford paid the remaining $325 on the fifteenth day of the month. She said that they paid their rent with money orders and that the Appellant "was going to get his money order there at the [little Mexican store]" when he was arrested. She said she had never known the Appellant to sell drugs.

On cross-examination, Mrs. Ashford testified that their home was small and that the Appellant's Percocet bottle was in the Buick's glove box on October 3 so that their grandchildren would not find the pills. The police seized the Appellant's rent money that day, so Mrs. Ashford had to borrow $300 to pay the rent. She denied that their financial situation was "tight." She acknowledged that she did not see what happened in the Mercedes.

At the conclusion of the proof, the jury found the Appellant guilty as charged of possession with intent to sell or deliver oxycodone, a Class C felony, and attempting to sell oxycodone, a Class D felony, as a lesser-included offense of selling oxycodone. After a sentencing hearing, the trial court ordered that the Appellant serve concurrent sentences of three and two years, respectively, and ordered that he serve the sentences on supervised probation.

## A. Motion to Suppress

The Appellant contends that the trial court erred by denying his pretrial motion to suppress the ninety-count prescription bottle for oxycodone, which contained fifty-four pills. He also contends that the statements he made to Detectives Grega and Spurlock after his arrest should be suppressed. He claims that while the officers' initial contact with him may have been a brief investigatory stop, it quickly escalated into a full-scale arrest for which they had no probable cause. The State argues that the trial court properly denied the motion because the officers' initial interaction with the Appellant was a brief police-citizen encounter that did not implicate constitutional protections. The State also argues that Detective Grega's seeing Tomberlind swallow pills quickly provided the officers with reasonable suspicion to detain the Appellant and that Detective Grega's speaking with the occupants of the Mercedes resulted in probable cause for the Appellant's arrest. We conclude that the trial court properly denied the motion to suppress.

At the suppression hearing, Detective Grega testified that on the morning of October 3, 2014, he and his fellow Unit members were to meet in a strip mall parking lot on Briley Parkway. Sergeant James King arrived first, contacted Detectives Grega and Spurlock, and told them about "what he was observing." When the two detectives arrived in the parking lot, they conducted surveillance on two cars, a Buick and a Mercedes, that were parked beside each other. The Appellant exited the Buick and got into the back seat of the Mercedes. Detective Grega stated as follows: "There was a transaction of an item between the backseat passenger and the front seat passenger. He gave those individuals an item, and they returned to him currency." The transaction lasted thirty seconds to one minute, and the Appellant got out of the Mercedes. He had money in his hand and walked back to the Buick. The State asked if the parking lot was in a high-crime area, and Detective Grega said no. He acknowledged that based upon his training and experience, he thought he had just witnessed a drug transaction.

Detective Grega testified that he got out of his unmarked vehicle and approached the Mercedes. Two females and one male were in the car, and Detective Grega was clearly marked as a police officer. When the male occupant saw Detective Grega, he swallowed a pill in his hand. Detective Grega also saw a pill in a clear cigarette wrapper, and the wrapper looked as if it had just been stuffed between the center console and the

front passenger seat. Detective Grega stated that after he saw the pill, he had the three people exit the Mercedes and gave them Miranda warnings. The female driver told him that she brought the two passengers to the parking lot to buy oxycodone from the Appellant, and the two passengers told him they bought pills from the Appellant for nine dollars per pill.

Detective Grega testified that he also gave Miranda warnings to the Appellant and that the Appellant agreed to speak with him. The Appellant told the officer that he sold the two passengers oxycodone pills for nine dollars per pill. The Appellant said he had just been diagnosed with lung cancer and was trying to make some extra money. Detective Grega arrested the Appellant, searched him, and found $320 on his person. He also searched the Buick and found an oxycodone prescription bottle that had been filled with ninety pills on October 2. Detective Grega stated, "$9 a pill from that fifty-four comes out to be about [$]320, [$]324."

On cross-examination, Detective Grega testified that he was in his vehicle less than ten minutes before he got out and approached the Mercedes. At first, he stated that he was "maybe" parked a couple of spaces from the Mercedes. However, he then acknowledged that he did not remember where he was parked but said he had a clear line of sight to the Mercedes. Detective Grega could not see the item that was exchanged between the Appellant and the passengers or the amount of money involved. He also could not hear the conversation in the Mercedes. After the transaction, the Appellant got out of the Mercedes and walked, not ran, back to the Buick, and Detective Grega did not see the Appellant with any drugs or drug paraphernalia. Detectives Grega and Spurlock got out of their vehicle, and Detective Grega walked to the Mercedes while Detective Spurlock walked to the Buick.

Detective Grega testified that when he approached the Mercedes, the male passenger put a pill in his mouth, which immediately attracted the detective's attention. Detective Grega got everyone out of the Mercedes and read Miranda warnings to the three of them at the same time. Detective Grega then turned his attention to the Appellant. He did not remember the Appellant's telling him that the money on his person was "rent money." Detective Grega told the Appellant that he had spoken with the people in the Mercedes. However, he did not think he told the Appellant that the passengers in the Mercedes would go to jail if the Appellant did not cooperate. Detective Grega said that he did not want to take the Appellant to jail because the Appellant was elderly but that "I had reason to believe he had just sold pills to somebody." Detective Grega said he later helped the Appellant by requesting that the commissioner not set a high bond. He acknowledged that he did not mention seeing a hand-to-hand transaction during the Appellant's preliminary hearing.

At the conclusion of Detective Grega's testimony, the following exchange occurred:

THE COURT: I'm trying to find out your articulable facts about why you stopped Mr. Ashford. What about the behavior other than he got in a car, you saw him getting out with cash, that would lead you to believe it was a crime as opposed to selling something from Craigslist or something like that? People do that in parking lots all the time to their detriment sometimes but -- do you see what I'm saying?

THE WITNESS: I see what you're saying.

THE COURT: I'm saying what is your articulable fact that this was a crime?

THE WITNESS: He -- he got into the vehicle with nothing in his hands and got out of the vehicle with money in his hands.

THE COURT: Okay.

THE WITNESS: We walk up to the vehicle -- I walk up to the [Mercedes] and see --

THE COURT: Okay. But I'm talking about the time he was stopped. I want to know what you knew when he was stopped.

. . . .

THE WITNESS: I don't know that I knew anything when he was stopped.


Detective Spurlock testified that on October 3, 2014, Sergeant King reported on the radio that two vehicles were in a parking lot at Briley Parkway and Glastonbury Road, that the cars were "side by side" or in close proximity to each other, and that he saw the occupant of one car get into the other car. Detective Spurlock said that based on Sergeant King's information, he and Detective Grega "went to investigate" and "sat on it for a minute." The detectives could see clearly into the Mercedes and saw the Appellant sitting in the back seat, behind the driver. They also saw "the money and hand exchange within that vehicle." Subsequently, the Appellant got out of the car, went back to his vehicle, and got into the vehicle. Detective Spurlock stated that "we pulled to the right of him, not blocking him in, got out, made contact with him." Detective Spurlock asked

- 9 -

what the Appellant was doing in the area, and the Appellant seemed nervous. Detective Spurlock said, "At that point I think Detective Grega observed something in the other vehicle and said, let's get them out and start talking to them. I later found out that he saw some pills in plain view and somebody swallowed some from the other vehicle." The officers got the Appellant out of his car and read Miranda warnings to him. The Appellant told the officers that "he was there to sell those pills that he recently got for $9 a piece."

On cross-examination, Detective Spurlock testified that he and Detective Grega watched the two cars for five or six minutes. Regarding the exchange inside the Mercedes, Detective Spurlock saw "[j]ust money and something else." The Appellant returned to his car after the exchange, and Detective Spurlock did not see any money in the Appellant's hands. After the Appellant got back into his car, Detective Grega pulled up to the right of the Mercedes, not to the left of the Appellant's car. Detective Spurlock approached the Appellant's vehicle while Detective Grega approached the Mercedes. Defense counsel then asked, "Mr. Ashford was not free to leave once you encountered him?" Detective Spurlock answered, "No, ma'am." He acknowledged that he never saw any drugs exchange hands but said, "I had reasonable suspicion something illegal [had occurred]."

Upon being questioned by the trial court, Detective Spurlock testified that while he was speaking with the Appellant, he heard Detective Grega say "[t]hat he observed something in plain view, a pill." Detective Spurlock got the Appellant out of his car and "patted him down." Defense counsel resumed its questioning of the witness, and the following exchange occurred:

> Q. . . . Just to be clear, Detective, you approached Mr. Ashford once he exited the [Mercedes]?
>
> A. Correct.
>
> Q. And you went up to his car?
>
> A. Yes, ma'am.
>
> Q. And you told him to get out of his car?
>
> A. Not initially but eventually, yes.
>
> Q. Upon your approach to the car Mr. Ashford was not free to leave?
>
> [THE STATE]: Your Honor --

- 10 -

THE WITNESS: Yes. I mean, at a point -- it was really quick at the time. Detective Grega saw what he saw, and I just started talking to him. It was maybe within a few seconds.

Q. . . . But you talked to Mr. Ashford first?

A. Uh-huh.

Q. And then you heard on the radio that there may be pills in the other car?

A. It wasn't on the radio. It was like just a few feet away.

Q. Then you heard Detective Grega say [there] were pills?

A. Yeah. After me walking up to him, he was free to leave at the initial first couple of words that came out of my mouth. But then it was several seconds later that he saw something.

Q. It's your testimony today that you didn't grab him?

A. No.

Q. Okay. And you didn't know about the pills upon your initial approach at the point of the initial conversation?

A. Just reasonable suspicion.

Q. But you didn't know?

A. No.

The Appellant testified that he was diagnosed with lung cancer in 2014. On the morning of October 3, he was on his way to get a money order for his rent. The Appellant always paid $300 in rent from his Social Security check, and his wife paid $300. The Appellant pulled into the parking lot at the strip mall on Briley Parkway and waited for the Mercedes because he wanted to ask the people in the Mercedes about the kind of pain medication he should be taking for his cancer. The Appellant's bottle of

- 11 -

pain medication was in the console of his car, and he did not have any pills in his pocket. The Appellant said he did not go to the strip mall to sell pills.

The Appellant testified that when his friends arrived in the Mercedes, he got into the Mercedes for six or seven minutes. While he was in the car, Tomberlind paid him five dollars Tomberlind owed him. The Appellant got out of the Mercedes and started to put the money into his pocket with his rent money. However, he never made it back to his car because Detective Spurlock immediately grabbed him, "shook [him] up," and wanted to know what he was doing there. The detective was wearing civilian clothes, and the Appellant did not know he was a police officer.

The Appellant testified that another officer "drove up," started talking to him, and asked if he was willing to make a "buy." The Appellant told the officer that he did not know what a "buy" was, and the officer said the Appellant was going to jail. The officers handcuffed the Appellant, and he did not hear them read Miranda warnings. The Appellant said that he did not tell the officers he had sold pills and that he heard the officers "badgering" Tomberlind by telling Tomberlind that "you're going to tell me this or you're going to jail with him."

On cross-examination, the Appellant testified that he was disabled, was unemployed, and had obtained the cash for his rent that morning at Walmart. After Detective Spurlock grabbed him, the Appellant told Detective Spurlock that he was sick. The Appellant said that Detective Spurlock "[s]lung" him around and that he did not see a police vest on the officer. The Appellant denied telling the officers that he sold pills to the passengers of the Mercedes for nine dollars each. He said that after the officers seized his pill bottle, they took the bottle to their truck and started counting the pills. The Appellant saw the officers drop at least five pills on the ground but did not see them pick up the pills.

Upon being questioned by the trial court, the Appellant said that prior to his arrest that morning, he was on his way to a liquor store to get the money order for his rent. He said he did not know why he did not get the money order while he was at Walmart.

In a written order, the trial court denied the motion to suppress. The court found that Detective Spurlock initially made a brief investigatory stop of the Appellant and that the officers' witnessing "a hand-to-hand [drug] transaction" in the Mercedes provided them with reasonable suspicion for the stop. The court also found that even though the stop quickly turned into a full detention, the detention was supported by probable cause because Detective Grega witnessed Tomberlind swallow a pill and saw a pill in plain view in the Mercedes.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and

resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against "unreasonable searches and seizures." In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009). However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed. State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). Our courts have thus articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted).

An "officer may approach an individual in a public place and ask questions without implicating constitutional protections" even when there is no basis for suspecting criminal activity. State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000). "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" Id. at 424 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In other words, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." Id. at 425. In determining when an encounter becomes a seizure, a court should consider all of the circumstances pertaining to the encounter. Id. Some relevant factors are as follows:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the

physical touching of the person of the citizen.

Id. at 426.

"Reasonable suspicion" for a detention is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

A full-scale arrest

> is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted). "Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Turning to the instant case, Detective Spurlock testified that he approached the Appellant, who was sitting in his car, and asked what he was doing in the area. The officer did not draw his weapon, use any physical force or show of authority, or block the Appellant's car with the officer's truck. Although the Appellant testified that Detective Spurlock approached him as soon as he got out of the Mercedes and grabbed him, Detective Spurlock testified that he approached the Appellant after the Appellant got back into his car and that he did not touch the Appellant. The trial court obviously accredited the officer's testimony over that of the Appellant. Accordingly, based upon our de novo review, we conclude that the Appellant was not seized or detained when Detective Spurlock initially approached the Appellant.

Almost immediately thereafter, though, Detective Grega saw Tomberlind swallow a pill and saw a pill in plain view in the Mercedes. Detective Grega's observations confirmed that the item exchanged in the Mercedes was drugs. Detective Spurlock testified at the suppression hearing and at trial that he heard Detective Grega call out something about what he had seen. At that point, Detective Spurlock's brief police-citizen encounter with the Appellant turned into a full-scale arrest as he got the Appellant out of the Buick, read Miranda warnings to the Appellant, and questioned the Appellant further. However, Detective Spurlock had probable cause for the Appellant's arrest. Thus, we affirm the trial court's denial of the motion to suppress.

### B. Cross-examination of Lonnie Tomberlind

The Appellant contends that the trial court erred by preventing him from cross-examining Lonnie Tomberlind about an unrelated pending charge because the charge related to Tomberlind's potential bias in favor of the State. The State acknowledges that the trial court erred but argues that the error was harmless. We agree with the State.

During a jury-out hearing, defense counsel advised the trial court that he wanted to question Tomberlind in front of the jury about Tomberlind's having a pending harassment charge. Defense counsel stated, "That's the only thing I will ask, that it's here in Davidson County and it's with the same office that is prosecuting this case, and that will be it." The trial court stated that while bias was always relevant, a witness's merely having a pending charge did not necessarily show bias. The trial court refused to let defense counsel question Tomberlind, stating that "you haven't shown anything other than he's been charged."

Tennessee Rule of Evidence 616 provides that a party "may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." As noted by the Advisory Commission Comment, "[b]ias is an important ground for impeachment." "The right to explore or examine witnesses for bias is a fundamental right." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). Furthermore, "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." Id. We will uphold the trial court's decision absent an abuse of discretion. Id.

As this court has explained, the potential for bias exists "[i]f a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial . . . [because] there is certainly possibility that the prosecutor's office is going to take favorable testimony into account when subsequently prosecuting the witness's pending charge." State v. Eric James Taylor, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. at Knoxville, July 9, 2003). Therefore, the court

should have allowed defense counsel to ask Tomberlind about his having a pending criminal charge in Davidson County.

Next, we must determine the effect of the trial court's error. Like other Confrontation Clause errors, the trial court's failure to allow the Appellant to question Tomberlind about his potential bias is a non-structural constitutional error. Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986); Sayles, 49 S.W.3d 275 at 280. Such errors do not require automatic reversal and are subject to harmless error analysis. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Id. The test to be applied is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)).

As noted by the State, Debra Hudson also testified that the Appellant sold her pills on October 3, 2014. Furthermore, Detectives Grega and Spurlock testified that the Appellant admitted to selling pills to the passengers in the Mercedes; that a pill-count of the Appellant's prescription bottle, filled just the previous day, revealed thirty-six pills were missing; and that a calculation of the missing pills being sold for nine dollars each was almost the exact amount of money found on the Appellant's person. Finally, defense counsel still exposed Tomberlind's potential for bias by revealing that he was charged only with and pled guilty to simple possession, which was expunged from his record, and by having Tomberlind admit on cross-examination that the officers threatened to take him to jail if he did not tell them the Appellant sold him pills. Thus, we agree with the State that the error was harmless.

## C. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the convictions because neither detective saw the item that was exchanged for money, no five- or one-dollar bills were found on the Appellant's person even though he allegedly was selling pills for nine dollars each, the detectives found only one pill in the Mercedes, Tomberlind gave "confusing and inconsistent" testimony regarding his purpose for meeting the Appellant, and the Appellant's wife explained to the jury why many pills were missing from his prescription bottle. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Taken in the light most favorable to the State, the evidence shows that the Appellant got into the back of the Mercedes and that he exchanged an item for money with at least one of the passengers. He then got out of the car and had the money in his hand. Both Tomberlind and Hudson testified that they bought oxycodone pills from the Appellant, Detective Grega saw Tomberlind swallow pills, and Detective Grega found one oxycodone pill in the Mercedes. When the officers questioned the Appellant, he told them that he had sold pills to the passengers for nine dollars per pill and that he needed the money because he had cancer. Moreover, the Appellant had a prescription for oxycodone, which he had filled the previous day for ninety pills. However, thirty-six pills were already missing from the bottle, and the Appellant had almost the exact amount of money on his person for having sold thirty-six pills for nine dollars per pill. It was the jury's duty to evaluate the credibility of the witnesses, to determine the weight given to their testimony, and to resolve all conflicts in the evidence. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We note that the jury found the Appellant guilty as charged of possessing oxycodone with intent to sell or deliver but found him guilty of attempting to sell oxycodone as a lesser-included offense of selling oxycodone. We conclude that the evidence is sufficient to support the Appellant's convictions.

D. Prosecutorial Misconduct

- 17 -

Finally, the Appellant contends that the State committed prosecutorial misconduct during closing arguments because the prosecutor "twice assailed the integrity of defense counsel, and in so doing, improperly argued matters outside of the record and injected into the trial issues broader than the guilt or innocence of the accused." The State argues that the Appellant has waived this issue and that, in any event, the prosecutor's statements do not constitute prosecutorial misconduct. We conclude that the Appellant is not entitled to relief.

Specifically, the Appellant takes issue with the following statements made during the prosecutor's rebuttal closing argument:

> The only thing you're here to do and the only thing we need you [to] do is determine what the facts were on the date in question. That's your only job. What [defense counsel has] done, talking about the defendant's health, the family situation, is insulting to the judicial process, and it's insulting to you. And when you don't have a defense to fall back on, oftentimes defense attorneys go to these non issues and talk about things that we call jury nullification. . . .

Later, the prosecutor stated as follows:

> Also with all due respect to [defense counsel] he says that the defense counsel is not trying to say that anybody is a bad person, that the police, we're not trying to say they're bad people. With all due respect yes, they are because --
>
> [Defense Counsel]: Objection.
>
> THE COURT: Overruled.
>
> [The State]: They are trying to say they're bad people. Because here's the thing, to vote not guilty is to say the officers who testified and for Officer Grega, who at least testified at two prior court proceedings, and Officer Spurlock, who testified in at least one prior court proceeding, all under oath lied each and every time.

In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In

making this determination, this court is guided by five factors:

> 1.  The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2.  The curative measures undertaken by the court and the prosecution.
>
> 3.  The intent of the prosecutor in making the improper statement.
>
> 4.  The cumulative effect of the improper conduct and any other errors in the record.
>
> 5.  The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). Furthermore, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Garner Dwight Padgett, No. M2003-00542-CCA-R3-CD, 2004 WL 2359849, at *12 (Tenn. Crim. App. at Nashville, Oct. 21, 2004).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether

statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Initially, we note that defense counsel did not make a contemporaneous objection to the prosecutor's first comments regarding defense counsel's insulting the judicial process and not having a defense to fall back on. A defendant's failure "to proffer contemporaneous objections to the challenged remarks" waives the issue on appeal. State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004); see Tenn. R. App. P. 36(a). Nevertheless, we can review the issue for plain error. Tenn. R. App. P. 36(b); see State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015). We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Turning to the instant case, the defense did not address the Appellant's having cancer or his "family situation" during its closing argument. Therefore, the prosecutor must have been referring to the evidence presented during the trial. We do not think defense counsel's presenting evidence of the Appellant's having cancer was insulting to the judicial process or the jury. While the evidence may have strategically garnered some sympathy for the Appellant, it was also an important aspect to his defense in that it provided him with a legitimate reason for possessing oxycodone. Moreover, defense counsel presented a logical defense by arguing that the detectives did not see the actual item passed from the Appellant to Tomberlind and Hudson, that there was a reasonable explanation for pills to be missing from the pill bottle, and that the denominations of currency found on the Appellant's person did not support his selling pills for nine dollars apiece. Thus, there was no basis for the prosecutor's comments, and we agree with the Appellant that the comments were improper. That said, we must conclude that the prosecutor's comments do not rise to the level of plain error. The passengers in the Mercedes and the Appellant himself admitted to his selling the pills. Thus, we conclude that the prosecutor's error did not change the outcome of the trial.

As to the prosecutor's comments regarding defense counsel's accusing Detectives Grega and Spurlock of being "bad people" and lying, the State argues that the Appellant has waived this issue because he failed to specify the reason for his objection. We disagree. As noted by the State, the party making an objection should state "the specific ground of objection if the specific ground was not apparent from the context." Tenn. R. Evid. 103(a)(1). In our view, the specific ground, i.e., that the prosecutor's comment was improper, was apparent. Therefore, the issue has not been waived.

The prosecutor was addressing the following statements made by the defense during its closing argument:

> Now, let me make myself crystal clear. This is not about anyone on this table being a bad person. It's not about the State being evil. It's not about, I don't know, officers being evil. That is not at all what this is about. That is not what I'm trying to tell you. . . .

> . . . .

> The testimony today is that Detective Grega pulls up in an elevated truck and that he's able to see things crystal clear. But the multiple times that he's testified before, that's never come up. He never said I was in an elevated truck. See, that's another inconsistency. He didn't bother in his narrative to say that he saw a hand-to-hand. He swore to tell the truth just weeks after this happened. He sat on a witness stand very similar to today, and at that time he did not mention under oath with his right hand up that there was a hand-to-hand. He didn't say it. . . . He swore under oath to tell the whole truth and nothing but the truth. . . . The issue is that's inconsistent, and it clouds the case. And the same goes for Mr. Ashford's statement that he admitted to selling the pills. Ya'll heard that Mr. Ashford was in handcuffs and that he was -- essentially he was under arrest, right? And I asked Detective Grega, you could have taken him to the precinct? Yes. You could have recorded his statement? Yes. He didn't refuse to talk to you, did he? No. He just didn't do that. [The State] will tell you that's not policy. This isn't about policy. It's about whether that statement was actually said. And the only person who told you that today were the two officers, Detectives Spurlock and Grega.

The Appellant contends that the prosecutor's comments were disparaging of

defense counsel, were designed to discredit counsel, and "cast [counsel] in a poor light." In our view, though, the prosecutor's statements were not improper. Although defense counsel initially said that he was not accusing the State's witnesses of being "bad people," counsel went on to make statements that could be interpreted as accusing Detectives Grega and Spurlock of lying at trial. Thus, we think the prosecutor was responding to defense counsel's argument and conclude that the prosecutor did not commit prosecutorial misconduct.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.


_____
NORMA MCGEE OGLE, JUDGE